IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Yvonne M. Watson, et al.,          :

          Plaintiffs,              :

          v.                       :     Case No. 2:07-cv-0777

Citi Corp.,                        :     MAGISTRATE JUDGE KEMP
et al.,
                                   :
          Defendants.

                    OPINION AND ORDER

     Plaintiffs Yvonne and Bradley Watson filed this action for
damages and injunctive relief against Experian Information
Solutions, Inc., ARS National Services, Inc. d/b/a Associated
Recovery Systems, and Citibank (South Dakota), N.A., asserting
claims for breach of contract, violations of the Fair Credit
Reporting Act, and willfully filing a fraudulent information
return in contravention of 26 U.S.C. §7434.  Mr. Watson's claims
were dismissed in their entirety, and Ms. Watson's claim against
Citibank under §7434 has also been dismissed by way of summary
judgment.  In addition, Ms. Watson settled her claims against
Experian and agreed to dismiss her claims against ARS
voluntarily.  On October 6, 2008, Ms. Watson's breach of contract
and FCRA claims against Citibank were tried before the
undersigned, sitting without a jury and with the consent of the
parties.  This opinion and order constitutes the Court's findings
of fact, conclusions of law, and decision with respect to the
matters tried.

              I.  Findings of Fact

     Yvonne Watson called Timothy Collins, Bradley Watson, and
herself as witnesses at the trial.  She also tendered various

plaintiff's exhibits, many of which were admitted into evidence. Citibank cross-examined plaintiff's witnesses, but did not offer any witnesses of its own. Citibank also introduced one defendant's exhibit which was admitted into evidence. At the close of evidence, Citibank orally moved for judgment as a matter of law on each of Ms. Watson's remaining claims. Following argument, the Court deferred ruling on Citibank's oral motion pending a final decision on the merits of Ms. Watson's claims.

A. <u>Testimony of Timothy Collins</u>

Timothy Collins is vice-president for risk management at ARS. ARS is a third-party collection agent for numerous entities, including Citibank. As vice-president for risk management, Mr. Collins oversees ARS's compliance with the Fair Debt Collection Practices Act and various state laws. He also serves as general counsel to ARS, handling legal matters for the company and managing outside litigation.

Citibank employed ARS as a collection agent through a series of annual contracts. These agreements established parameters for the settlement of accounts in default and required ARS to provide status reports to Citibank for all referred accounts at varied time frames as well as upon request. Plaintiff's Exhibit 10, which was identified by Mr. Collins and admitted into evidence without objection, is a collection agency agreement between ARS and Citibank with an effective date of January 1, 2004. ARS acted pursuant to this agreement when it sent an offer letter to Ms. Watson in February 2004. Mr. Collins identified Plaintiff's Exhibit 1 as a copy of this letter.

ARS sent the letter on behalf of itself and Citibank after Citibank referred Ms. Watson's account to ARS for collection. The letter indicated the amount due was $13,581.39 and stated that if Ms. Watson remitted the sum of $9,506.97 (70% of what Citibank and ARS claimed was owed), ARS and Citibank would

consider the account as paid in full with a $0 balance.  Mr.
Collins testified that Citibank gave ARS the authority to make
this settlement offer, but that Citibank did not set the actual
terms of the offer.  On March 4, 2004, ARS received a letter from
Ms. Watson responding to this offer and enclosing a $7,000.00
check.  Ms. Watson's counter-offer contained the proviso that
ARS's cashing of the check would constitute its acceptance of the
counter-offer to settle the account in full.  ARS cashed the
$7,000.00 check and did not engage in any further collection
efforts with respect to the Citibank account.  Although its
account notes from that time period do not reflect that ARS
regarded the account as settled, Mr. Collins could not explain
why ARS's collection efforts ceased after March 4, 2004.  Mr.
Collins testified that it was ARS's practice at that time to cash
checks with restrictive endorsements and then try to collect the
difference between what it had agreed to accept and the actual
amount of the check.

The collection agency agreement required ARS to send copies
of all correspondence from debtors to Citibank.  Mr. Collins
testified that while he had not seen a record of ARS sending a
copy of Ms. Watson's counter-offer to Citibank, it would have
been ARS's normal practice to have done so.  At the time of the
letter, ARS was sending weekly reports to Citibank on each
referred account.  ARS's records, in fact, show that it sent an
electronic notice to Citibank when the $7,000.00 check was
cashed.  According to its account notes, an ARS supervisor noted
the amount of the check and verified that a credit for this
amount was posted to the Citibank account in question.

ARS did not, however, send a letter to Citibank indicating
that the account had been settled; nor did it send such a letter
to Ms. Watson.  Citibank continued to provide interest updates on
Ms. Watson's account to ARS for the months of May, June, and

July.  On August 24, 2004, Citibank recalled the account from ARS.  Recall meant that ARS no longer could work the account. Following the recall, ARS listed the status code for this account as "cancelled."  On August 31, 2005, ARS changed the status code to "SIF" meaning that the account had been settled in full.  Mr. Collins could not say whether the change occurred at Citibank's request, but acknowledged that ARS must have had received some direction from Citibank in light of the fact the account had been recalled a year earlier.

### B. <u>Testimony of Bradley Watson</u>

Bradley Watson is Yvonne Watson's husband.  At all relevant times, he paid the household bills, including credit card accounts.  Ms. Watson did not generally see the bills during this time.  Around October 2003, Mr. Watson began to see collection letters, some of which came from Citibank or its collection agents.  He recalled that the last Citibank collection letter he saw showed a balance of $11-12,000.00.  Earlier letters had reflected a balance of just over $10,000.00.  Whenever Mr. Watson came across an offer to settle an account, he passed it on to his wife.  Ms. Watson would then question him concerning the balance on the account to determine whether to make a counter-offer.  Ms. Watson ultimately made counter-offers to at least three creditors who had sent offer letters.  She expected to receive an inheritance of more than $200,000.00 from her father's estate which she intended to use as a funding source for these counter-offers.

Mr. Watson specifically remembered discussing the Citibank account balance with his wife.  He informed her that the amount owed was a little over $10,000.00.  As was the case with many of their other debts, the Citibank account went into default due to a severe drop in his income coupled with the fact that his was the only significant household income at that time.  The family's

medical bills, as well as attorney's fees associated with the efforts of Ms. Watson's brother to regain custody of his children, further contributed to their financial demise. Mr. Watson did not recall the identity of creditors other than Citibank whose accounts were in default, except for J.C. Penny which was his debt, and not his wife's.

Mr. Watson was present on at least three occasions when his wife spoke on the telephone with Citibank in 2005. On one such occasion, at her request, he listened in on another extension and heard his wife ask Citibank why the balance on the Mastercard account had not been changed to zero. He could tell from the representative's response that she did not believe that the account had been settled. The representative eventually gave in, but threatened to retaliate by sending the Watsons a Form 1099-C for discharge of indebtedness. He and his wife did, in fact, receive a Form 1099-C from Citibank following this conversation, but it was, in his view, for the wrong tax year.

In 2006, the Internal Revenue Service sent the Watsons a letter informing them of an audit for the previous tax year based on some unreported income earned by Mr. Watson and the IRS's receipt of the Form 1099-C. Mr. Watson re-checked their joint federal return and discovered that the IRS was correct with respect to his unreported income. He immediately paid the tax attributable to this income, but their tax case remains unresolved due to the dispute over the Form 1099-C.

### C. Testimony of Yvonne Watson

Yvonne Watson testified in narrative form subject to Citibank's cross-examination. She described how several of her accounts, including the Citibank Mastercard, went into default. In Fall 2003, she received a portion of an inheritance from her father's estate, but did not know if she would receive additional monies because her siblings were challenging the validity of her

adoption in probate court.  Ms. Watson intended to use her inheritance to settle those accounts in default.

Ms. Watson sent out letters to some of her creditors, but initially received no response.  She then began to look at certain collection letters and respond to them with counter-offers.  In February 2004, she received an offer letter from ARS. ARS stated in the letter that its settlement offer had been authorized by Citibank.  According to the offer, ARS agreed to accept payment of a sum that was less than the total amount owed in full settlement of the Citibank Mastercard.  Upon payment of this lesser amount, ARS and Citibank would report the account as settled in full with a $0 balance.

Based on conversations with her husband, Ms. Watson believed that the amount she actually owed on the account was roughly $10,000.00, which was considerably less than was indicated on ARS's settlement offer.  She, therefore, responded to ARS's letter by proposing a counter-offer of $7,000.00 (70% of what she believed was owed).  Ms. Watson enclosed a check for this amount and stated in her letter that cashing the check would constitute ARS's and Citibank's acceptance of the $7,000.00 as payment of the account in full.  Her letter further stated that she and her husband would refrain from filing bankruptcy for a period of 90 days if her counter-offer was accepted.

After sending her response to ARS, Ms. Watson monitored her checking account and saw that the check had cleared.  She then telephoned Citibank to report the settlement.  Her testimony confirmed that neither she nor her husband filed a petition in bankruptcy within the next 90 days or thereafter.

Ms. Watson did not hear back from ARS or Citibank after the check was cashed.  For various reasons, including the fact that no further collection activity took place, she did not follow up on the purported settlement for more than a year.

-6-

In June 2005, the Defense Logistics Agency contacted Ms. Watson for a second interview regarding a human resources position. She was offered the position with a starting salary of $73,000.00, but needed to obtain a security clearance before her employment could commence. The process for obtaining a security clearance included a review of her credit history. Ms. Watson decided to take a closer look at her credit report and, when she did so, discovered that the Citibank account continued to be listed on her Experian credit report as in default with a balance due.

Ms. Watson completed her application for a security clearance, and the investigative process began. The persons who conducted her background check were not permitted to keep her apprised of their investigation, but she received a request form in July 2005 indicating to her that her credit history would be an issue. Ms. Watson furnished the additional information requested, and the investigation continued.

Ms. Watson inquired from time to time concerning the status of her security clearance. On October 3, 2005, she was advised that the investigation was still pending. Approximately five weeks later, DLA informed her that the investigation had entered the adjudication stage, but that no decision had been made, and that the time frame for each case can vary from a few days to months.

On June 29, 2006, investigators from the Office of Personnel Management interviewed Ms. Watson at her home regarding certain derogatory information contained in her TransUnion credit report. The interview focused on the Citibank Mastercard account, an account with LVNV Funding, and two past-due medical bills. Ms. Watson believed that the LVNV Funding account had already been resolved and had documentation evidencing this settlement. By the time her interview took place, this account no longer

appeared on her credit report as delinquent. Ms. Watson was also able to verify to the OPM investigators that the two medical bills were covered by one or more health insurance policies. Once the medical providers billed the insurance companies, these bills were satisfied. A field investigation conducted by OPM in August 2006 indicated that only the Citibank account was still a matter of concern. In response to this investigation, Citibank provided records to OPM showing a $0 balance on the account, but these records also reflected a charge-off of $11,957.90 on July 10, 2003.

While she waited for her security clearance investigation to complete, Ms. Watson actively sought other employment in both the public and private sectors. Her physical disabilities hindered her efforts, and her job search was ultimately unsuccessful. She did, however, maintain a part-time private law practice in the interim. On July 31, 2007, Ms. Watson finally obtained her security clearance and was given a starting date at the DLA Training Center of August 20, 2007. She now makes a salary in excess of $80,000.00 and received a $6,000.00 bonus last year.

On March 15, 2004, Citibank posted a $7,000.00 payment from ARS to Ms. Watson's Mastercard account, but did not show the account as settled in full on its internal statements until September 6, 2005. See Plaintiff's Exhibit 19. Those statements were apparently not sent to Ms. Watson at the time, but were subsequently produced by Citibank during the course of this litigation. Citibank, however, never called her during this time frame and never took any action to collect the balance its statements showed was due.

Ms. Watson filed numerous reports with Experian disputing the information regarding the Citibank account that appeared on her credit report. She testified that, as a result of her filing these reports, Citibank received thirteen ACDVs, rather than the

four acknowledged by Citibank in its motion for summary judgment. She claims that, despite the receipt of these ACDVs, Citibank failed to contact ARS to determine if, in fact, the account had been settled.

Ms. Watson wrote a letter to Citibank on July 24, 2005, in which she informed the defendant of the settlement and provided copies of both her letter to ARS and the $7,000.00 check. In addition, Ms. Watson telephoned Citibank several times regarding the settlement. On one of these occasions, she asked her husband to listen in on her conversation with a Citibank customer service representative. The representative threatened to create trouble for the Watsons. Ms. Watson believes that the representative followed through on this threat by causing the Form 1099-C to be filed.

On July 21, 2005, Ms. Watson also sent a letter to Experian regarding certain accounts listed on her credit report for which there was negative information. In her letter, Ms. Watson asked Experian to remove the potentially damaging credit history for eight separate accounts. The disputed accounts included the Citibank Mastercard, U.S. Bank, LVNV Funding, a second Citibank account, Rossman & Co. (for OSU Hospital Anesthesia Services), and OSI Collection Services (for Grant Medical Center). A corrections summary prepared by Experian on May 18, 2005, showed that Experian had earlier investigated ten credit items at Ms. Watson's request. As the result of that investigation, four of the items were deleted with the other six labeled as "remains" or updated. Ms. Watson did not know what the term "remains" meant. In contrast to the negative information, many of the accounts were listed in the Experian credit reports as paid.

Ms. Watson claims that as the result of Citibank's failure to report her Mastercard account as settled in full with a $0 balance, she suffered damages in the form of two year's worth of

salary, bonuses, and within grade increases which she would have received had she obtained her security clearance at an earlier date. Ms. Watson, however, did not offer testimony from any OPM officials to support her claim. She further contends that her damages were not in any way offset by income from her private practice since she now spends approximately the same amount of time in her law business as she did while waiting for her security clearance.

II. <u>Conclusions of Law</u>

This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§1331, 1332(a), 1367(a) and 15 U.S.C. §1681p. The parties having unanimously consented to the exercise of jurisdiction under 28 U.S.C. §636(c), this Magistrate Judge is duly authorized to conduct any and all proceedings in this nonjury civil matter and may enter final judgment in this case. Venue is not contested and is proper under 28 U.S.C. §1391(b).

Two claims survived Citibank's motion for summary judgment. The first claim is for breach of contract based on Citibank's failure to report to Experian that the MasterCard account was settled in full and had a $0 balance once ARS cashed Ms. Watson's $7,000.00 check. The second claim is an action under 15 U.S.C. §1681s-2(b) based on Citibank's alleged failure to conduct a reasonable investigation after receiving multiple notices from Experian that Ms. Watson disputed the accuracy of the credit reporting information Citibank had provided on the MasterCard account. As noted in the opinion and order on Citibank's motion for summary judgment, only those violations of the FCRA occurring after August 8, 2005, are actionable given the two-year statute of limitation for such claims and the date upon which Ms. Watson commenced this lawsuit.

## A. Breach of Contract Claim

The Court concludes that Ohio law governs the plaintiff's breach of contract claim. A federal court exercising diversity jurisdiction must apply the law of the forum state, including that state's choice-of-law canons. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). Absent an effective choice-of-law provision, Ohio courts will apply the law of the state with the "most significant relationship" to the contract. See Gries Sports Enterprises, Inc. v. Modell, 473 N.E.2d 807, 810 (Ohio 1984)(adopting Restatement (Second) of Conflicts of Laws §187).

Although the original Mastercard account agreement between Citibank and Ms. Watson contained a choice-of-law provision applying South Dakota law, the plaintiff has not sued under that contract, but pursuant to a subsequent accord and satisfaction in which the parties did not choose the applicable governing law. With respect to this contract, Ohio bears the most significant relationship. ARS mailed the original settlement to Ms. Watson at her residence in Ohio. That offer contemplated that Ms. Watson would remit a sum certain in full satisfaction of the debt. Ms. Watson then made a counteroffer and enclosed a check for $7,000.00 drawn on funds from her bank account in Ohio. While ARS and Citicorp were incorporated in California and Delaware, respectively, both defendants have significant ties to the State of Ohio which are applicable to this case. Citicorp offers credit cards and other banking services to customers, such as Ms. Watson, in Ohio. ARS services credit accounts for Citicorp's customers who reside in Ohio. Ohio has a strong interest in applying its law where the place of contracting, place of performance, the location of the contract's subject matter, and the parties' place of business exist in this state. See Gries, supra.

Under Ohio law, a plaintiff who maintains an action for breach of contract must prove by a preponderance of the evidence (1) the existence of a contract between the plaintiff and the defendant; (2) that the plaintiff fulfilled its obligations under the contract; (3) that the defendant failed to fulfill its obligations under the contract, and (4) that the plaintiff sustained damages as the result of the defendant's failure to fulfill its obligations under the contract.  See Lawrence v. Lorain County Community College, 713 N.E.2d 478, 480 (Ohio Ct. App. 1998).

The Court concludes that Ms. Watson has satisfied the first three elements of her claim against Citicorp.  A contract was formed in March 2004 when ARS, as Citicorp's agent, cashed Ms. Watson's $7,000.00 check and thereby accepted her counteroffer. Under the terms of the resulting contract, Ms. Watson was obligated to pay the sum of $7,000.00 and to refrain from filing a petition in bankruptcy for at least 90 days from the cashing of her check.  Ms. Watson fulfilled her obligations under the contract.  In return, Citicorp was obligated to report the Mastercard account as paid in full with a $0 balance.  Citicorp failed to fulfill this obligation for more than a year despite repeated communications from Ms. Watson that the account had been settled and its receipt of copies of both her letter to ARS and the cancelled check.

The Court concludes, however, that Ms. Watson did not demonstrate that she sustained damages as the result of Citibank's failure to fulfill its contractual obligations.  "As a general rule, an injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty..."  Rhodes v. Rhodes Indus., Inc., 595 N.E.2d 441, 448 (Ohio Ct. App. 1991).  Speculative damages are not recoverable.  Champion Ice Mfg. & Cold Storage Co. v.

<u>Pennsylvania Ironworks Co.</u>, 67 N.E. 486 (Ohio 1903). The claimed damages in this case are in the form of lost salary and benefits allegedly flowing from Ms. Watson's delay in obtaining a security clearance. Ms. Watson argues that but for Citibank's breach, the field investigation conducted by OPM would not have been necessary.

The chronology of events, however, make this link too remote. The OPM investigators did not even conduct their personal interview of Ms. Watson until a year after she had been offered the position. During that June 29, 2006 interview, they questioned her not only about her credit history regarding the Citibank Mastercard, but also concerning at least three other credit tranctions. It may be true that the other negative credit items were resolved prior to the field investigation in August 2006. It is also true that it was not until Citibank was contacted by OPM in the course of the field investigation that Citibank finally changed its records to reflect that the Mastercard account had a balance of $0. Yet, Ms. Watson's security clearance still was not approved for another year after the field investigation was completed.

The Court is influenced in this decision by the total absence of evidence from anyone involved in the security clearance process that, but for this one credit report, Ms. Watson would have been granted her clearance on an earlier date. It is reasonable to infer that a background investigation and a decision to grant a security clearance take many factors into account, and that delay is an ordinary part of the process. Ms. Watson did not call any witness to testify about this process, to explain the delay or to relate it to the issue about this disputed account. Given this absence of proof, the Court is not persuaded by a preponderance of the evidence that the delay in granting Ms. Watson the security clearance was causally related

to Citibank's breach of contract.

In conclusion, Ms. Watson proved a breach of contract at trial, but failed to prove actual damages arising from that breach. Under these circumstances, she is entitled to nominal damages. See DeCastro v. Wellston City School Dist. Bd. Of Educ., 761 N.E.2d 612 (Ohio 2002); see also Toledo Group, Inc. v. Benton Industries, Inc., 623 N.E.2d 205, 211 (Ohio Ct. App. 1993). "Nominal damages" constitute a small amount of money such as one dollar. Id.

B. FCRA Claim

The FCRA places a duty on furnishers of credit information to provide accurate information to consumer reporting agencies regarding consumer credit and a duty to correct and update information that is inaccurate. See 15 U.S.C. §1681s-2(a). After receiving notice from a consumer reporting agency that the information provided is disputed, the furnisher of such information shall conduct an investigation concerning the disputed information, review all relevant information provided by the consumer reporting agency, report the results of its investigation to the consumer reporting agency, and correct any item of information found to be inaccurate or incomplete. See 15 U.S.C. §1681s-2(b)(1). Although a consumer may not bring a private cause of action against a furnisher of information for a violation of §1681s-2(a), such a private right does exist with respect to the duties imposed by §1681s-2(b). See Bach v. First Union National Bank, 149 Fed. App'x 354, 358-59 (6th Cir. 2005); see also Sweitzer v. American Express Centurion Bank, 554 F.Supp. 2d 788, 794 (S.D. Ohio 2008); Stafford v. Cross Country Bank, 262 F.Supp.2d 776, 782-83 (W.D. Ky. 2003).

For purposes of the FCRA, Ms. Watson is a "consumer," Experian is a "consumer reporting agency," and Citibank is a "furnisher of information." To prevail on a claim under §1681s-

2(b), Ms. Watson needed to prove that (1) Experian notified
Citibank that the information regarding the Mastercard account
was disputed; (2) that Citibank failed to comply with one or more
of its duties after receiving the notice of dispute; and (3) that
such non-compliance was either negligent or willful.  See id. at
783-84.

While Ms. Watson claimed at trial that Citibank received
some thirteen notices of dispute (ACDVs) from Experian regarding
the Mastercard account, only four of the ACDVs were the subject
of this Court's opinion and order on Citibank's motion for
summary judgment.  Of these four, the Court determined that two
were received within the statute of limitations period mandated
by 15 U.S.C. §1681p.  Because Citibank responded to the final
ACDV by modifying the information it provided to Experian to
reflect a balance of $0 on the Mastercard account, the sole ACDV
at issue appears to be the one to which Citibank responded on
August 9, 2005, still showing a balance of $7,966.  To the extent
that Ms. Watson maintains that there are other ACDVs that may be
actionable, this fact is not apparent from the record.  See
Plaintiff's Exhibit 22.

Having received the notice of dispute, Citibank was required
to conduct a reasonable investigation of its records to determine
whether the disputed information could be verified.  See Johnson
v. MBNA America Bank, N.A., 357 F.3d 426, 431 (4th Cir. 2004).
In this case, such an investigation would have revealed that
Citibank had referred the Mastercard account to ARS for
collection.  This fact, together with the notice of Ms. Watson's
claim that she had settled the account in full with ARS, should
have caused Citibank, in the course of a reasonable
investigation, to contact ARS to obtain the details of this
settlement.  The fact that Citibank did not contact ARS, but
merely relied on its own incomplete records, leads this Court to

conclude that Citibank failed to comply with its duty to conduct a reasonable investigation after receiving the ACDV from Experian.

If Citibank's breach of its duty under §1681s-2(b)(1)is deemed to have been negligent, Ms. Watson may recover actual damages and the costs of this action, which normally would include her attorney's fees.  See 15 U.S.C. §1681o.  Because she represented herself, however, such fees are unavailable here. See Trikas v. Universal Card Services Corp., 351 F.Supp.2d 37, 45 (E.D.N.Y. 2005).  In the case of a defendant's willful noncompliance with the statute, a successful plaintiff may recover actual damages or statutory damages of $1,000.00, whichever is greater, as well as punitive damages.  See 15 U.S.C. §1681n.  For purposes of the FCRA, "willful noncompliance" means a knowing and intentional act committed in conscious disregard of the rights of others.  Boris v. Choicepoint Services, Inc., 249 F.Supp.2d 851, 861-62 (W.D. Ky. 2003)(citing Bakker v. McKinnon, 152 F.3d 1007, 1013 (8th Cir. 1998)).

To recover actual damages, Ms. Watson must prove that Citibank's violation of the FCRA caused her injury.  See Bach, 149 Fed. App'x at 360-61; Lewis v. Ohio Professional Elec. Network, LLC, 248 F.Supp.2d 693, 701 (S.D. Ohio 2003)(citing Crabill v. Trans Union, LLC, 259 F.3d 662, 664 (7th Cir. 2001)). Actual damages will not be presumed under the FCRA.  Ruffin-Thompkins v. Experian Information Solutions, Inc., 422 F.3d 603, 610 (7th Cir. 2005).  The fact that Ms. Watson's security clearance was delayed, without proof that this delay was caused by Citibank's noncompliance, is insufficient to establish actual damages.  See Pettus v. TRW Consumer Credit Serv., 879 F.Supp.2d 695, 698 (W.D. Tex. 1994).  Accordingly, for the same reasons that Ms. Watson failed to establish actual damages for Citibank's breach of contract, she has not come forward with proof of actual

damages attributable to Citibank's failure to conduct a reasonable investigation. The Court further concludes that Ms. Watson failed to prove that Citibank's noncompliance was anything other than negligent. Therefore, she is not entitled to recover statutory or punitive damages under §1681n.

## III.

Based on the foregoing reasons judgment shall be entered in favor of plaintiff Yvonne M. Watson and against defendant Citibank (South Dakota), N.A., for the sum of $1.00 and costs on plaintiff's breach of contract claim. It is further ordered that Ms. Watson recover her costs in prosecuting her claim against Citibank under the Fair Credit Reporting Act. Such costs shall not include attorney's fees notwithstanding the fact that Ms. Watson is an attorney.

/s/ Terence P. Kemp
United States Magistrate Judge